**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **MONIQUE RODWELL, BRANDEN RODWELL, JAYKIL RODWELL, and JASPER SPIVEY** | |
| **Plaintiffs,** | Civ. No. 22-06427 (KM) (JSA) |
| **v.** | **OPINION** |
| **CITY OF NEWARK; MAYOR RAS BARAKA, individually and in his official capacity; FORMER PUBLIC SAFETY DIRECTOR BRIAN O'HARA, individually and in his official capacity; AMIRI BARAKA, JR., individually and in his official capacity; SGT. TARAY J. TUCKER, individually and in his official capacity; SGT. LUIS RIVERA, individually and in his official capacity; DET. M. DASILVA, individually and in his official capacity; DET. C. SERRANO, individually and in his official capacity; FORMER CAPTAIN RASHEEN PEPPERS, individually and in his official capacity; LT. P. RANGES; DET. THOMAS BENDER; and JOHN DOES 1 through 10, JANE DOES 1 through 10, and ABC CORP. through XYZ, individually, jointly, and severally,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

      This case arises out of a June 2021 altercation between plaintiffs Jaykil Rodwell, Branden Rodwell, Jasper Spivey, and their brother Justin Rodwell on one side, and defendant law enforcement officers Detective M. DaSilva, Detective C. Serrano, and Lieutenant P. Ranges on the other. The altercation

began when the three officers allegedly assaulted Jaykil Rodwell outside his home without identifying themselves as members of law enforcement, prompting his brothers to intervene. The result was a prolonged scuffle that ultimately led to the arrest of all four brothers. Monique Rodwell, the mother of the four men, subsequently spoke out against the treatment of her sons by law enforcement and organized protests to which, she alleges, Mayor Ras Baraka and other local officials responded with a "campaign of harassment and intimidation" against her and her family.

Monique Rodwell, Branden Rodwell, Jaykil Rodwell, and Jasper Spivey (collectively "Plaintiffs") bring this action against the City of Newark (the "City"), Mayor Baraka, and certain current and former city officials and law enforcement officers (collectively "Defendants")[1], asserting various tort, constitutional, and statutory claims in connection with these events.

Now before the Court are two motions: 1) the City of Newark's motion to dismiss Counts Two, Four, Five, Six, Seven, Eight, and Nine[2] of the amended complaint as "shotgun pleadings" under Fed. R. Civ. P. 8(a), or alternatively to dismiss Count Five for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) (DE 10); and 2) Mayor Baraka's motion for judgment on the pleadings as to Count Eight of the amended complaint pursuant to Fed R. Civ. P. 12(c) (DE 12). For the reasons set forth herein, the City of Newark's motion to dismiss Count Five (*Monell* liability) is **DENIED**, but its motion to dismiss a Counts Two, Four, Six, Seven, Eight, and Nine is **GRANTED**. Mayor Baraka's motion for judgment on the pleadings is

---

[1]     Plaintiffs also name as defendants "John Does 1 through 10," "Jane Does 1 through 10," and "ABC Corp. through XYZ," noting in their amended complaint that these are "fictitious names of other individuals who aided and abetted and/or conspired with [the] defendants . . . " (Compl. ¶ 11.) I disregard these placeholders.

[2]     Plaintiffs organize their causes of action under headings titled "First Claim for Relief," "Second Claim for Relief," and so on. For concision, I refer to them as "Count One," "Count Two," etc.

**GRANTED**. The amended complaint remains in effect as to all remaining Defendants and Counts.

## I. BACKGROUND

### A. Factual Allegations

On June 1, 2021, plaintiffs Jaykil Rodwell and Jasper Spivey, along with their brother Justin Rodwell, were standing outside of their home in Newark, New Jersey. Defendants Detective M. DaSilva, Detective C. Serrano, and Lieutenant P. Ranges[3] approached them while dressed in plain clothes and driving unmarked vehicles. (Compl. ¶¶ 13-14.)[4] The three officers got out of their vehicles, but did not announce themselves as law enforcement. DaSilva snatched a fanny pack from Jaykil's person while Serrano and Ranges proceeded to assault Jaykil. (*Id.* ¶ 15.) Unaware that the three men were law enforcement officers, Jasper and Justin intervened to protect their brother and to recover his property. (*Id.* ¶ 16.) Jasper told DaSilva to return the fanny pack, at which time DaSilva refused and began to assault Jasper. (*Id.*) During the melee, Jasper managed to take back the fanny pack, but dropped it as he tried

---

[3]    Plaintiffs allege that the three men were officers of the Essex County Prosecutor's Office assigned at the time to the Newark Police Department's Criminal Intelligence Section. (Compl. ¶ 13.)

[4]    Certain citations to record are abbreviated as follows:

> "DE" = Docket entry number in this case
>
> "Newark Mot." = Defendant, City of Newark's Memorandum of Law in Support of Motion to Dismiss Pursuant to Fed. R. Civ. P. 8(a)(2), 12(b)(6) & 12(f) (DE 10-1)
>
> "Baraka Mot." = Brief in Support of Defendant Mayor Ras Baraka's Notice of Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (DE 12-2)
>
> "Compl." = First Amended Complaint and Demand for Jury Trial (DE 13)
>
> "Opp." = Plaintiffs' Brief in Opposition to Motion to Dismiss Complaint (DE 14)
>
> "Newark Reply" = Defendant, City of Newark's Reply Brief in Further Support of Motion to Dismiss Pursuant to Fed. R. Civ. P. 8(a)(2), 12(b)(6) & 12(f) (DE 17)

to escape Serrano who began punching him repeatedly in the face. (*Id.*) Shortly after, plaintiff Branden Rodwell, another brother who had been inside the family home, saw his brothers being attacked and came to Jaykil and Jasper's aid. (*Id.* ¶ 17.) By this time, the officers still had not identified themselves or stated their purpose. (*Id.*) The scuffle came to an end when Jaykil and Jasper fled and their older brothers, Branden and Justin, were arrested. (*Id.*) Jasper and Jaykil voluntarily turned themselves in the next day. (*Id.*)

Following the altercation and the arrest of Branden and Justin Rodwell (the "June 1 Incident"), defendant supervisors Sergeant Luis Rivera and Sergeant Taray J. Tucker approved a police report containing false claims that the brothers incited mob violence and assaulted the officers by kicking, choking, punching, and pushing them on sight.[5] (*Id.* ¶ 18.) This report was then adopted by James Stewart, President of the Fraternal Order of Police, as well as defendant Brian O'Hara, the former Public Safety Director for the City of Newark, both of whom reiterated the claims in official statements they issued to the media regarding the June 1 Incident in order to cover up that the officers "subjected Jaykil to racial profiling, unlawful detention, and assault and battery." (*Id.* ¶¶ 18-19.) According to Plaintiffs, defendant Mayor Ras Baraka also issued a false public statement in furtherance of the alleged coverup, in which he commended the actions of the officers and disparaged the brothers. (*Id.* ¶ 19.)

On June 2, 2021, the day after the incident, defendant Detective Thomas Bender of the Essex County Prosecutor's Office prepared a search warrant

---

[5]     The complaint also describes additional reports prepared by DaSilva and Serrano approximately six days after the June 1 Incident. Plaintiffs allege that these reports falsely claimed that the officers had a reasonable articulable suspicion that Jaykill possessed a gun in his fanny pack prior to stopping him. (Compl. ¶ 32.) The report also contained purported false claims that the officers identified themselves as police at the initial stop and that DaSilva informed Serrano during the stop that he felt a gun when he first grabbed the fanny pack. (*Id.* ¶ 33.) Relatedly, Plaintiffs claim DaSilva manipulated and destroyed the audio of the body camera footage of the June 1 Incident so that it could not refute his version of the story. (*Id.*)

affidavit that also contained false claims that the brothers had incited mob violence and that Jaykil possessed a gun during the encounter with the officers.[6] (*Id.* ¶ 20) Based on Bender's affidavit, a search warrant was issued authorizing law enforcement to search the brothers' home. (*Id.*) During the execution of the search warrant, other members of the Rodwell family—including plaintiff Monique Rodwell, the mother of the four brothers involved in the June 1 Incident, and Zahir Rodwell, a minor child—were allegedly held at gunpoint or handcuffed.[7] (*Id.* ¶ 21.) According to Plaintiffs, given that the four brothers were in custody and none of them were charged with a weapons-related offense, the search was conducted "for no other purpose than to further cover up the unlawful actions of the defendant officers and to terrorize the family into silence." (*Id.* ¶¶ 21-22.)

Around June 5, 2021, Monique Rodwell, joined by family, friends, and other supporters, appeared at the stationhouse of the Newark Police Department's 5th Precinct to protest the detention of her four sons. (*Id.* ¶ 25.) As the protesters were gathering, defendants Amiri Baraka, who is Chief of Staff to Mayor Ras Baraka, and O'Hara invited Monique into the stationhouse under the guise of facilitating a call with one of her sons, with whom she had not been able to communicate since his arrest. (*Id.* ¶ 26.) While inside, O'Hara and Amiri Baraka—both of whom Plaintiffs contend were communicating on behalf of the City and Mayor Baraka—directed Monique not to protest her sons' arrest or to gather supporters at her house. (*Id.*) During this conversation, Amiri Baraka allegedly acknowledged that the defendant officers had no reason to stop Jaykil and that none of the officers identified themselves as law

---

[6]    No gun was recovered during the June 1 Incident and the fanny pack was never opened. (Compl. ¶ 20.) Moreover, the search warrant affidavit did not mention that the four brothers were now in custody, which—according to Plaintiffs—"l[eft] the unfair impression that a violent assailant in possession of a gun was still at large." (*Id.* ¶ 23.)

[7]    Plaintiffs allege that the officers conducting the search destroyed expensive medication that was prescribed to treat certain of Zahir's medical conditions. (Compl. ¶ 21.)

enforcement during their encounter with her sons. (*Id.*) Nevertheless, both defendants O'Hara and Amiri Baraka insisted that Monique "tone things down." (*Id.* ¶ 27.) Monique responded that she would not tell her supporters to stop protesting, nor would she refrain from gathering supporters at her house, because she was "gravely concerned about what had happened to her sons and their wellbeing." (*Id.*)

Plaintiffs claim that they then faced a "campaign of harassment and intimidation against the entire Rodwell family [that was] spearheaded by Mayor Baraka, Chief of Staff [Amiri] Baraka, [and] O'Hara, and carried out by defendant [Rasheen] Peppers, then Captain of the South Ward, and his subordinates." (*Id.* ¶ 25.) For instance, later in the day when Monique and her supporters gathered at her home, "they were met with police helicopters flown low over the Rodwell house and a police mobile station parked outside as a further attempt to harass, terrorize, intimidate, and silence the Rodwell family." (*Id.* ¶ 27.) Plaintiffs also claim that local officials and police officers from both the Newark Police Department and the Essex County Prosecutor's Office showed up at their house on multiple occasions to "intimidate and harass the Rodwell family into silence." (*Id.* ¶ 28.) Moreover, defendants Mayor Baraka and O'Hara directed constant police surveillance of the Rodwell family. (*Id.* ¶ 28.) Police officers, under the supervision of defendant Peppers, followed Monique and her sons Branden, Jaykil, and Jasper,[8] stopped visitors from entering the Rodwell house, forced other visitors to show identification before entering the block on which the family lived, drove marked and unmarked police vehicles past the home on a regular basis, and "flashed police lights directly into the house at all times of night." (*Id.* ¶ 29.)

During the second week of June 2021, plaintiff Monique Rodwell met with Mayor Baraka at Newark City Hall. (*Id.* ¶ 30.) At that meeting, Mayor

---

[8]     By this time, Branden, Jaykil, and Jasper had been released from jail and placed on pretrial supervision pending resolution of the criminal charges. (Compl. ¶ 29.)

Baraka directed Monique to stop protesting on behalf of her sons, indicating that he had seen the video of her sons' arrest, but there was nothing he could do to intervene. (*Id.*) Monique responded by asking Mayor Baraka to put a stop to the harassment her family was facing at hand of the Newark police. (*Id.*) Plaintiffs claim that Monique's "pleas to Mayor Baraka and other City officials" were futile, as "the police harassment, threats, and intimidation continued unabated for approximately five months causing the plaintiffs great fear and discomfort in their home." (*Id.*)

In connection with these events, Plaintiffs now bring claims against certain of the defendant officers for 1) assault and battery, 2) false imprisonment and unlawful search, 3) excessive force, 4) breach of duty, 5) racial profiling and discrimination, and 6) infliction of emotional distress for their actions against Jaykil Rodwell during the June 1 Incident, as well as 7) a *Monell*[9] liability claim against the City of Newark and defendant Ranges for DaSilva and Serrano's alleged constitutional violations. (*Id.* ¶¶ 45-70.) In addition, Plaintiffs assert 8) a First Amendment retaliation claim against defendants Mayor Baraka, Amiri Baraka, and Brian O'Hara in connection with their purported efforts to stifle plaintiff Monique Rodwell's attempts to speak out and assemble a protest against the treatment of her sons by law enforcement. (*Id.* ¶¶ 71-73.) Finally, Plaintiffs assert 9) an abuse of process claim against defendants DaSilva, Serrano, Ranges, Tucker, and Rivera for falsifying police reports and obtaining a search warrant without probable cause, purportedly to intimidate and harass the Rodwell family. (*Id.* ¶¶ 74-75.)

**B. Procedural History**

Plaintiffs initiated this action on November 2, 2022. (DE 1.) On December 14, 2022, the City of Newark filed a motion to dismiss what are currently designated as Counts Two, Four, Five, Six, Seven, Eight, and Nine of the amended complaint. The City's motion seeks to dismiss all of those counts as "shotgun pleadings" under Fed. R. Civ. P. 8(a), and alternatively seeks to

---

[9]     *See Monell v. Dept of Social Services of City of New York*, 436 U.S. 658 (1978).

dismiss Count Five for failure to state a claim pursuant to

Fed. R. Civ. P. 12(b)(6). (DE 10.) On December 21, 2022, Mayor Baraka filed a separate motion to dismiss for failure to state a claim. (DE 12.) On January 2, 2023, Plaintiffs filed an amended complaint (DE 13), as well as a joint opposition to the motions filed by City of Newark and Mayor Baraka (DE 14.) On January 10, 2023, the City of Newark filed a reply brief in further support of its motion to dismiss. (DE 17.) On February 16, 2023, Mayor Baraka filed an answer to the amended complaint, raising various affirmative defenses. (DE 20.)

On May 10, 2023, Magistrate Judge Jessica Allen held a case management conference to clarify the parties' positions with respect to the amended complaint, given that the pending motions were addressed to Plaintiffs' initial, not amended, complaint. At the conclusion of the conference, Judge Allen ordered the City of Newark to file a letter confirming its position that the amendments to the complaint do not cure the deficiencies in the original complaint, and agreeing that the Court may consider the City of Newark's pending motion to dismiss as being addressed to the amended complaint. (DE 30.) Judge Allen further ordered Mayor Baraka to file a letter either confirming the same and requesting that his pending motion to dismiss be treated as a motion for judgment on the pleadings (since he had already filed an answer to the amended complaint), or else withdrawing his pending motion to dismiss. (*Id.*) On May 10, 2023, the City of Newark confirmed by letter that the Court may consider its pending motion to dismiss as addressed to the amended complaint, and on May 11, 2023, Mayor Baraka likewise confirmed by letter that the Court may treat his pending motion to dismiss as a motion for judgment on the pleadings. (DE 31, 32.) I will analyze the pending motions accordingly.

8

## II.   CITY OF NEWARK'S MOTION TO DISMISS

### A. Legal Standard

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in Plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

### B. Analysis

The City of Newark moves to dismiss Counts Two, Four, Five, Six, Seven, Eight, and Nine of the amended complaint. (Newark Mot. at 6-36.) In order, those counts include—as Plaintiffs describe them—claims of 1) false imprisonment and unlawful search, 2) negligence, 3) *Monell* liability, 4) racial profiling and discrimination, 5) infliction of emotional distress, 6) First Amendment violation, and 7) abuse of process. The City contends that these counts constitute "shotgun pleadings" that merit dismissal under Fed. R. Civ. P. 8(a). (Newark Mot. at 1, 12, 36.) As to Count Five, the City argues in the alternative that this *Monell* claim must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (*Id.* at 1-2.)

#### 1. "Shotgun pleading"

While I disagree with the City's contention that Counts Two, Four, Six, Seven, Eight, and Nine of the amended complaint constitute impermissible "shotgun pleadings," I will nevertheless dismiss those Counts as against the City only. They do not name the City, and the City's liability is most pertinently

considered in relation to the *Monell* claim contained in Count Five, discussed below.

The City argues that these counts 1) fail to "separat[e] into a different count each cause of action of claim for relief" or that they 2) "assert claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." (*Id.* at 12, 36 (quoting *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 359).) The touchstone inquiry under Rule 8(a) is whether the pleading "fail[s] to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."[10] *Id.* (quoting *Weiland*, 792 F.3d at 1323); *Ingris*, 2015 WL 3613499 at *5; *Sheeran*, 2015 WL 9048979 at *3. For example, a complaint may be dismissed where it "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Bartol*, 251 F. Supp. 3d at 859 (quoting *Weiland*, 792 F.3d at 1321–23). In *Bartol* the court rejected a complaint which, in blanket fashion, asserted a § 1983 claim in thirteen counts against seven defendants, many of whom were not present during the events which formed the basis for the claim and who seemed to have had no interaction with the plaintiff at all. *Id.* at 860. The court concluded that it was "far from clear against which defendants many of the claims are brought" and

---

[10]    There is no requirement that each count name only one defendant. While I note that courts in this district have concluded that "group pleadings are improper," *Green v. 712 Broadway, LLC*, 2018 WL 2754075 at *3 (D.N.J. June 8, 2018), it is clear those opinions meant only to rule out collective allegations which make it indecipherable "what each particular defendant is alleged to have done." *Id.* (quoting *Ingris v. Borough of Caldwell*, 2015 WL 3613499 at *5 (D.N.J. June 9, 2015); *see also Sheeran v. Blyth Shipholding S.A.*, 2015 WL 9048979 at *3 (D.N.J. Dec. 16, 2015) ("group pleading" fails Rule 8 where it "does not place Defendants on notice of the claims against each of them."); *H2O Plus, LLC v. Arch Personal Care Prods., L.P.*, 2011 WL 2038775 at *2 (D.N.J. May 22, 2011) (group pleadings did not violate Rule 8 where plaintiff clarified which claims were against which defendant in attached exhibits).

noted that the plaintiff had failed to define who he meant by "individual defendants" but had directed some counts solely against said individuals. *Id.*

Here, Plaintiffs' pleading certainly could have been clearer. There is no great mystery, however, as to which counts are asserted against which defendants. Immediately after the subheading for each count in the amended complaint, Plaintiffs name the specific defendant or defendants whose actions form the basis of their claim for relief. For instance, under Count Two ("false imprisonment/unlawful search"), Plaintiffs specifically allege that *defendants DaSilva, Serrano, and Ranges'* "actions in initially stopping and searching plaintiff Jaykil in front of his home absent sufficient reasonable suspicion and/or probable cause of criminal activity constituted false imprisonment." (Compl. ¶ 47.) Indeed, Plaintiffs concede in their opposition that they do not assert Count Two against the City, stating that the City "is not even named in plaintiffs' second claim for relief" and that the City "does not even represent . . . the subject defendant officers." (Opp. at 13.) In fact, looking to the balance of Plaintiffs' claims, all but one of the counts challenged by the City are explicitly directed exclusively at defendants other than the City. Plaintiffs assert Count Four against the "defendant officers" DaSilva, Serrano, and Ranges, along with "Defendants O'Hara and Captain Peppers" (Compl. ¶ 52); Count Six against "defendants Det. M. DaSilva, Det. C. Serrano, and Lt. P. Ranges" (*Id.* ¶ 63), subsequently clarifying that that "[t]he defendant officers [also] include Sgt. Taray J. Tucker and Sgt. Luis Rivera" (*Id.* ¶); Count Seven against "[a]ll named defendants who assaulted, racially profiled, and unlawfully detained/searched plaintiff Jaykil" (*Id.* ¶ 69); Count Eight against "Defendants Mayor Baraka, Chief of Staff Baraka and O'Hara" (*Id.* ¶ 71); and Count Nine against "Defendants Det. M. DaSilva, Det. C. Serrano, Lt. P. Ranges, Sgt. Taray J. Tucker, and Sgt. Luis Rivera," along with "Defendant Det. Thomas Bender" (*Id.* ¶ 74).

Accordingly, I will grant the City's motion to dismiss as to Counts Two, Four, Six, Seven, Eight, and Nine, for the sole reason that those claims do not

appear to have been brought against the City in the first place. To be clear, those claims remain live as against the defendants who are named therein.

### 2. The City's *Monell* liability (Count Five)

The only count that Plaintiffs specifically assert against the City of Newark is Count Five, a *Monell* claim:

> Defendant City of Newark, in violation of 42 U.S.C. § 1983, failed in their duty to plaintiff to adequately train/supervise/discipline the defendant officers who, acting within the scope of their employment and pursuant to municipal policy and custom, racially profiled, unlawfully seized plaintiff Jaykil, and fabricated evidence in violation of 42 U.S.C § 1981, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, the laws of the State of New Jersey, and the New Jersey State Constitution. Such a failure on the part of the defendant City of Newark amounted to a deliberate indifference to the constitutional rights of plaintiff Jaykil.

(*Id.* P. 54.) To be sure, the constitutional violations alleged against the individual officers are *relevant* to the City's liability, and if those individual claims should fail, any claim that the City is derivatively liable may fail as well. That issue, however, is not currently before the Court. If the City is to be liable for those acts, however, it must be *via* some version of a *Monell* theory. It follows that Count Five is the chokepoint for municipal liability, and I focus on it here.

Under *Monell,* "for municipal liability to attach, any injury must be inflicted by 'execution of a government's policy or custom.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010) (quoting *Monell*, 436 U.S. at 694). A municipal policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (internal quotations omitted); *Butler v. Lamont*, 732 F. App'x 125, 127 (3d Cir. 2018). A municipal custom may be shown where a course of conduct, though not authorized by law, is "so permanent and well-

settled as to virtually constitute law." *Andrews*, 895 F.2d at 1480; *Butler*, 732 F. App'x at 127. One such custom is "deliberate indifference" toward the class of persons who might suffer a constitutional injury as a result of the conduct in question. *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059-60 (3d Cir. 1991). Inadequate police training, for instance, may serve as the basis for municipal liability under § 1983, but only where the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The deliberate indifference standard is a demanding one, "requiring proof that a municipal actor disregarded a known or obvious consequence of his [or her] action." *Connick v. Thompson*, 563 U.S. 51 (2011) (internal quotation omitted).

Plaintiffs allege: 1) the City "failed in their duty to plaintiff to adequately train/supervise/discipline the defendant officers" (Compl. ¶ 54); 2) the City of Newark "adopted a custom and policy of allowing its police officers to violate the constitutional rights of its black citizens" (*id.* ¶ 56); 3) "Defendants Mayor Baraka and O'Hara . . . issued official statements to the media commending and praising the actions of [the] defendant officers" (*id.*); and 4) the City was "well aware of the [Newark Police Department's] pattern of disparate treatment based on race," citing *inter alia* a 2014 investigation by the United States Department of Justice, a 2020 article by Jon Schuppe analyzing Newark Police Department data regarding police stops and use of force, and similar data from the month of the June 1 Incident (*id.* ¶¶ 57-61).

The amended version of the Count Five *Monell* claim does not contain any factual allegations regarding the training, whether adequate or inadequate, that the City gave these defendant officers. Nor does it factually allege failure to discipline these defendant officers. A *Monell* liability claim premised on a failure to discipline generally requires a plaintiff to allege past complaints against the offending officer(s) that did not result in disciplinary action, a requirement Plaintiffs do not satisfy here. *See Katzenmoyer v. Camden Police Dep't*, No. CIV. 08-1995 RBK/JS, 2012 WL 6691746, at *5 (D.N.J. Dec. 21, 2012) (finding no

*Monell* liability where plaintiff "cannot show that either of the two particular officers in question . . . had a history with multiple excessive force complaints). *See also Wnek v. City of Philadelphia*, No. CIV.A. 05-CV-3065, 2007 WL 1410361, at *3 (E.D. Pa. May 10, 2007) (". . . a city may be liable for its failure to discipline an officer after multiple complaints against him, particularly where the prior conduct which the officer engaged in is similar to the conduct which forms the basis for the suit.") (quotation and citations omitted). Nor does the amended complaint point to any express official policy that resulted in the alleged violations here. *See McTeman*, 564 F.3d at 658 (indicating that "[t]o satisfy the pleading standard" for a *Monell* claim a plaintiff "must identify a custom or policy, and specify what exactly that custom or policy was."); *Wood v. Williams*, 568 F. App'x 100, 104-05 (3d Cir. 2014) (affirming dismissal of *Monell* claims where "the complaint made conclusory and general claims of failure to screen, train, or supervise employees to avoid constitutional violations.").

I therefore set aside the failure-to-discipline, failure-to-train, and express policy theories as being insufficiently linked to these officers as a factual matter.

Rather, I take the complaint to be more generally alleging a *de facto* municipal policy, evidenced by a custom or practice of indifference to disparate police treatment and excessive force directed against African-American citizens. The *Monell* claim, viewed in this light, consists of legal boilerplate, but that boilerplate is buttressed by more general data regarding stops, searches, and use of force by the Newark Police Department.[11] I do not suggest that this

---

[11]   For ease of reference, I reprint the relevant allegations here:

57. The City of Newark, Mayor Baraka, and O'Hara were well aware of the NPD's pattern of disparate treatment based on race, unlawful detention, use of excessive force, and violations of First Amendment rights in retaliation. Pursuant to a 2014 investigation conducted by the United States Department of Justice-Civil Rights Division, the NPD engaged in such prohibited behavior which disproportionately affected black citizens. As a result, the City of Newark,

---

entered into the 2016 Consent Decree, amended in 2018, as a remedial effort.

58. According to 2019 NDP statistics, published in a 2020 article by Jon Schuppe, entitled "Newark, N.J., wants to be a model for police reform. But Black people are still stopped more often," black people are still 1.5 times likely to be stopped as white people and police force is 2.7 times more likely to be used against black people than white. 59. For the month and year Jaykil was stopped, June 2021, statistics published by the NPD show that of the people stopped city-wide for "Field Inquires," 1,666 were black and 402 were white. 321 of those people who ended up being arrested were black, while 48 were white. 267 searched were black, while only 34 were white. 30 black people were subjected to the use of force, while forced was used against white people 4 times. The statistics for people who were detained pursuant to an investigatory stop were not provided.

60. According to Mr. Schuppe's reporting, the racial disparity in police stops and use of force has increased since the adoption of the 2016 consent decree. This is so even though Peter Harvey, Esq., Independent Federal Monitor, was put in place to monitor and oversee enforcement of the 2016 Consent Decree, amended in 2018, and provided a budget of $7.4 million over a 5-year period to accomplish the Consent Decrees delineated mandates. The mission has failed on purpose. When Mr. Harvey was informed about this case, he refused to respond at all, but indicated in an open forum that he was not inclined to monitor individual cases, preferring to rely solely on the conclusions of auditing and polling companies on his payroll.

61. The City of Newark focuses on ensuring its officers attend training and teaching them how to write clever police reports, but this approach provides no deterrence for NPD officers intent on violating the rights of black people they encounter on the streets. According to Mr. Harvey's December 28, 2021 Nineteenth Quarterly Report, the NPD failed its First Stop Audit, relating to investigatory stops and detentions. Moreover, in his most recent Twentieth Quarterly report, dated April 28, 2022, his team has not even assessed whether the NPD's Fair and Impartial Policing training had even incorporated the mandates of the 2016 consent decree. Under the guise of reform, the City of Newark only plays lip service to change, and leaves virtually unmolested its pre-Consent Decree patterns and practices of disparate treatment based on race in the area of police detentions, use of excessive force, arrests, and retaliation.

15

evidence would suffice to carry the plaintiffs' burden of proof on a *Monell* claim at trial, or even on summary judgment. Far from it; to begin with, the plaintiffs would have to prove that the officers in fact violated their rights, and then causally link any such violations to a municipal custom or policy. The Magistrate Judge supervising discovery may wish to prioritize discovery in that manner.

For the present, however, and in consideration of the fact that many of the relevant facts are in the City's control, I find that *Monell* liability has been adequately alleged. The City of Newark's motion to dismiss Count Five of the amended complaint will therefore be denied.

## III.   MAYOR BARAKA'S MOTION FOR JUDGMENT ON THE PLEADINGS

### A. Legal Standard

Federal Rule of Civil Procedure Rule 12(c) provides for judgment on the pleadings after the pleadings have been closed. A motion for judgment on the pleadings will be granted "if, on the basis of the pleadings, the movant is entitled to judgment as a matter of law. The court will accept the complaint's well-pleaded allegations as true, and construe the complaint in the light most favorable to the nonmoving party, but will not accept unsupported conclusory statements." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262-263 (3d Cir. 2008) (internal citations omitted). For present purposes, the standards governing a Rule 12(c) motion and a Rule 12(b)(6) motion are similar. *See Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004).

### B. Analysis

Mayor Baraka moves pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings as to Plaintiffs' First Amendment retaliation claim against him. (Baraka Mot. at 3.) Because Plaintiffs do not plead facts sufficient to support such a claim, their First Amendment retaliation claim will be dismissed.

"To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove that (1) [s]he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to

deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 863 (3d Cir. 2019).

For purposes of this motion, Mayor Baraka does not contest the first element, *i.e.*, that Monique Rodwell's right to speak out and organize a protest against the treatment of her sons by law enforcement was protected under the First Amendment. (Baraka Mot. at 3-4.) Nevertheless, Plaintiffs' claim is deficient because it does not plausibly allege that Mayor Baraka engaged in any retaliatory action. Plaintiffs allege that Mayor Baraka engaged in a "campaign of harassment and intimidation" meant to "intimidate and harass the Rodwell family into silence." (Compl. ¶¶ 25, 28.) Specifically, Plaintiffs allege that after defendants O'Hara and Amiri Baraka urged Monique Rodwell not to protest—a directive with which she refused to comply—local law enforcement engaged in "constant police surveillance, blocking off the streets, and preventing anybody from going to the Rodwell's house who did not show they lived there." (*Id.* ¶¶ 27-28.) Moreover, Plaintiffs allege further harassment in the form of "police helicopters flown low over the Rodwell house, . . . a police mobile station parked outside," multiple intimidating visits from law enforcement officials, and police vehicles that "flashed police lights directly into the house at all times of night." (*Id.* ¶¶ 27-29.) But none of these allegations specifically attribute any retaliatory action to Mayor Baraka. Aside from the vague assertion that Mayor Baraka "directed" and "spearheaded" the alleged harassment (*id.* ¶¶ 25, 28), Plaintiffs do not plead facts that establish a connection between any action taken by Mayor Baraka and any of the purportedly abusive conduct by local law enforcement.

Indeed, in their entire complaint, Plaintiffs allege only two specific actions taken by Mayor Baraka: 1) that Mayor Baraka issued a false statement regarding the June 1 Incident in which he commended the actions of the defendant officers, despite their impropriety (*id.* ¶ 19), and 2) that Mayor

17

Baraka met with Monique Rodwell at Newark City Hall and told her to stop protesting on behalf of her sons (*id.* ¶ 30). The first of these allegations is irrelevant to Plaintiffs' First Amendment retaliation claim, and the second, standing alone, is insufficient to plausibly allege that Mayor Baraka "engaged in retaliatory action sufficient to deter [Plaintiffs] from exercising [their] constitutional rights." *Javitz*, 940 F.3d at 863. Without additional factual support tying Mayor Baraka to the alleged retaliatory conduct, Plaintiffs' First Amendment retaliation claim must fail.

Plaintiffs' First Amendment retaliation claim (Count Eight) will be dismissed as against Mayor Baraka.

## IV.   CONCLUSION

For the reasons set forth above, the City of Newark's motion to dismiss Count Five (*Monell* liability) is **DENIED**, but its motion to dismiss all remaining Counts is **GRANTED**. Mayor Baraka's motion for judgment on the pleadings is **GRANTED**. These dismissals are granted without prejudice to the submission of a proposed amended complaint within 45 days, without the necessity of a formal motion to amend. If no proposed amended complaint is filed, the dismissals shall ripen into dismissals with prejudice.

An appropriate order follows.

Dated: September 5, 2023

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

18